UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RUFUS SPEARMAN #320836,

    Plaintiff,                                        Hon. Janet T. Neff

v.                                                        Case No. 1:17-cv-1070

CHAD WILLIAMS, et al.,

    Defendants.
_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Defendants' Motion to Dismiss. (ECF No. 21). Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Defendants' motion be **granted** and this action **terminated**.

## BACKGROUND

Plaintiff is incarcerated with the Michigan Department of Corrections (MDOC) at the Earnest C. Brooks Correctional Facility (LRF). The events giving rise to this action, however, occurred at the Carson City Correctional Facility (DRF). Plaintiff sues the following DRF officials: Assistant Resident Unit Supervisors (ARUSs) Chad H. Williams and Unknown Gehoski; Correctional Officers Unknown Osbourne, Unknown Ley, and Unknown Youngert; Deputy Wardens David Fenby and Unknown Krick; and Lieutenant Unknown Shinaberg.

In his amended complaint, Plaintiff describes a series of alleged acts of retaliation, beginning on April 21, 2014, and ending on August 27, 2014, all allegedly arising out of grievances Plaintiff filed concerning his lack religious accommodations and staff corruption involving misuse of

the prisoner telephone system. Plaintiff contends that all Defendants thereafter conspired to engage in an "orchestrated campaign of harassment . . . in the form of threats, verbal abuse, taunting, property deprivations, and sexual harassment."

Plaintiff chronicles a series of events which occurred in the three-plus weeks preceding the first alleged retaliatory action by Defendants. Plaintiff filed a grievance against the DRF chaplain Susan Cleveland on March 26, 2018, for failing to respond to his requests for religious accommodation. Two days later, Plaintiff filed a grievance against unnamed MDOC officials and the telephone company about the telephone system. On April 1, 2014, Plaintiff sent copies of the telephone grievance to various state and federal authorities and the MDOC director. One week after filing his third grievance, on April 8, 2014, Plaintiff was attacked by two inmates. Plaintiff does not allege that any Defendant induced that attack or was aware that it would happen. On April 13, 2014, Plaintiff filed a second grievance about his religious accommodations. He filed a Step-II appeal of his second grievance on April 18, 2014.

On April 21, 2014, Defendant Ley informed Plaintiff that he was being moved to the 500 Housing Unit. Plaintiff told Ley that he could not be moved to Unit 500, because other inmates were calling him names, such as "coward" and "pussy," and threating to "whup" him for not fighting back when he was attacked on April 8, 2014. Plaintiff concluded that he would not be safe in the 500 Unit. Defendant Ley responded that they were moving Plaintiff into the unit in place of a prisoner who had been causing problems. Plaintiff contends that Ley's response indicated that they could have chosen anyone to move, but chose Plaintiff in retaliation for his having filed multiple grievances. Plaintiff alleges that as he was being moved prisoners yelled threats and taunted him. Plaintiff suggests that the taunts indicate that other prisoners had been made aware that he was being transferred

-2-

to the unit.

Once he arrived at the control center, Plaintiff discussed his concerns with Defendant Shinaberg. He then waited for several hours until Defendant Gehoski arrived. Gehoski explained that Plaintiff was being moved from Unit 1200 to Unit 500 because there was a problem managing a prisoner in Unit 500. Plaintiff advised Gehoski about his safety concerns, but Gehoski did not change the assignment. Three days later, on April 24, 2014, Plaintiff was taunted for more than an hour by a gang member, who was being egged on by others. When Plaintiff turned his back, the gang member attacked Plaintiff, forcing Plaintiff to fight for his life. Plaintiff suffered damage to his left eye, his temporal bone, and his vision, as well as a dislocated thumb. The following morning, after being let out of his room, Plaintiff notified Officers Hengesbach and Thomsen and Defendants Osbourne and Williams. When Plaintiff asked for a room change, Hengesbach told Plaintiff to deal with it and not ask to be moved again. When Plaintiff later asked Hengesbach, Thomsen, and Defendant Osbourne, Hengesbach unholstered his taser and suggested that he would test it.

As Plaintiff left Hengesbach's office, he saw Defendant Williams, who was leaving the unit. Williams responded, "[I]'m leaving, I don't give a f**k if you kill each other. It's not my problem, it's your problem." Plaintiff then refused to return to his dangerous living situation, for which he was issued a misconduct ticket. He was escorted to the control center, where he explained his concerns to Defendants Krick, Williams, and Osbourne, as well as an unknown captain. Plaintiff was instructed to write a statement requesting protective custody. After he did so, he was moved to a different room on a different wing in Unit 500.

Defendants Hengesbach and Osbourne packed Plaintiff's property for the move, but when Plaintiff received it later that day, he was missing his television, his religious scrolls, and his

-3-

shoes. At breakfast, Plaintiff notified Sergeant Collins of his missing property. While he was eating, Plaintiff spotted the inmate who had attacked him, who was wearing Plaintiff's shoes. Plaintiff confronted the man, who told Plaintiff that Defendant Osbourne had left them behind when he packed up Plaintiff's property. Plaintiff demanded that the prisoner return his shoes, which the prisoner promised to do when he returned to the unit. When Plaintiff returned to the unit, he confronted Defendants Osbourne and Hengesbach, telling them that the other prisoner had informed him that Osbourne and Hengesbach had left Plaintiff's shoes and Plaintiff's television in the cell. Osbourne started yelling, "[H]e's a fucking rat Hengesbach! He's a snitch." This occurred during mass movement, causing many prisoners to overhear. Minutes later, Defendant Youngert returned Plaintiff's television, but Plaintiff never received his religious scrolls, which deprived Plaintiff from practicing his Nuwaubian religion.

The following day, April 25, 2014, Plaintiff's newly assigned roommate threatened to kill Plaintiff for attempting to connect his television cable cord to the wall outlet. The man stated, "[Y]ou got nothing coming . . . C/O's say you bold." Plaintiff contends that the word "bold" is used regularly by corrupt officials when a prisoner is disfavored, and its use leads to inmate attacks, withholding of mail, food contamination, and refusals to open the cell door for appointments. On May 14, 2014, Defendant Williams refused to process a disbursement request for Plaintiff, preventing him from mailing some Step-II grievance appeals to another prison. When Plaintiff continued to ask for the disbursement, Defendant Williams responded, "Will someone taze this motherfucker and get him out of here." When Plaintiff turned around, he nearly ran into Defendant Osbourne, who was pointing his taser at Plaintiff.

Plaintiff filed a grievance on May 16, 2014, against Defendants Gehoski, Shinaberg,

Ley, Fenby, Williams, Krick, and any other person involved in the decision to transfer him to Unit 500. He filed another grievance on June 2, 2014, against health services, alleging that he had been denied medical treatment for an unspecified need. On July 6, 2014, he filed another grievance against Defendant Osbourne for unspecified retaliatory harassment.

On July 22, 2014, while Plaintiff was leaning over a table to sign a receipt, Defendant Youngert walked up to him and stopped, with his crotch near Plaintiff's face. Plaintiff stood up and stepped away, telling Youngert that he objected to having his "personal space" violated. Youngert responded, "[I]'ll violate whatever I want to violate, you just have to deal with it." Youngert began to walk toward Plaintiff, and Plaintiff retreated to his room. Plaintiff filed a grievance against Youngert three days later. Two weeks later, on August 7, 2014, Plaintiff filed another grievance, alleging that Youngert and Williams had conspired to increase Plaintiff's security classification because Plaintiff had filed the grievance against Youngert on July 25, 2014. Plaintiff also alleged that Fenby had threatened to effectuate Youngert's and Williams' retaliation by making the following statement: "[T]his don't sound right [the recommendation by defendant Williams], but you can believe [I]'m gonna' lay you down."

On August 18, 2014, Defendant Youngert allegedly attempted to provoke Plaintiff into an act of aggression. Youngert verbally berated Plaintiff and spit in Plaintiff's face, saying, "[W]hat you gone do bitch, [I]'ll fuck you up." Plaintiff remained calm. He filed a grievance against Youngert on August 19, 2014. The grievance was assigned to Resident Unit Manager J. Dunigan. The following day, Defendants Williams and Fenby increased Plaintiff's security classification and transferred him to a Level V prison. The change to Plaintiff's classification and prison assignment resulted in the confiscation of the majority of his personal property, including his beard trimmer,

-5-

watch, and personal clothing.  Plaintiff also was subjected to greater restrictions on his movements and fewer privileges.

Plaintiff contends that Defendants Gehoski, Shinaberg, Ley, Fenby, Williams, and Krick deprived him of his First Amendment right to be free from retaliation for filing grievances about his religious accommodations and the telephone system.  He also alleges that the same Defendants were deliberately indifferent to his safety and security, in violation of the Eighth Amendment. Plaintiff argues that Defendant Osbourne was deliberately indifferent to his safety when Osbourne loudly called Plaintiff a rat and a snitch in the presence of other prisoners.   In addition, he complains that Defendants Osbourne, Williams, and Youngert subjected him to a campaign of verbal harassment, sexual harassment, and property deprivation in retaliation for formally complaining about prison conditions and mistreatment, in violation of his right to equal protection.  Further, he alleges that Defendant Williams, by attempting to change Plaintiff's security classification, retaliated against him as part of a conspiracy.  Plaintiff also alleges that Defendant Youngert violated Plaintiff's Eighth Amendment rights by spitting in his face and making verbal threats of further assault.  Plaintiff complains that Defendants Fenby and Williams retaliated against him for filing grievances when they increased his security level and transferred him to a Level-V prison.  Finally, Plaintiff argues that Defendant Osbourne placed a substantial burden on his right to the free exercise of his religion when Osbourn discarded or gave away Plaintiff's religious reading materials.

On December 19, 2017, the Honorable Janet T. Neff dismissed Plaintiff's claims against Defendants Shinaberg, Osbourne, Gehoski, Ley, and Krick for failure to state a claim on which relief may be granted. (ECF No. 13-14).  As to Defendants Williams, Fenby, and Youngert, the Court dismissed Plaintiff's claims that accrued prior to July 24, 2014, on the ground that such were

untimely filed. (ECF No. 13-14). Accordingly, the only claims remaining in this matter are: (1) (1) on August 7, 2014, Defendant Fenby conspired with Defendants Youngert and Williams to change Plaintiff's security classification, even though it did not appear appropriate; (2) on August 18, 2014, Defendant Youngert verbally abused Plaintiff, spit in his face, and threatened to hurt Plaintiff if he responded to the provocation; and (3) on August 26, 2014, in retaliation for Plaintiff's grievances, Defendants Williams and Fenby increased Plaintiff's security classification and transferred him to a Level-V prison. Defendants Williams, Fenby, and Youngert now move for relief on the ground that they are entitled to qualified immunity.

## LEGAL STANDARD

A.   Qualified Immunity

The doctrine of qualified immunity recognizes that government officials must be able to carry out their duties without fear of harassing litigation. *See Davis v. Scherer*, 468 U.S. 183, 195 (1984). As is well recognized, they can do so only if they reasonably can anticipate when their conduct may give rise to liability for damages, and if unjustified lawsuits are quickly terminated. *Ibid.* Generally, when government officials perform discretionary functions, they are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also, Behrens v. Pelletier*, 516 U.S. 299, 301 (1996). The question whether a defendant enjoys qualified immunity is a question of law for the Court to resolve. *See Virgili v. Gilbert*, 272 F.3d 391, 392 (6th Cir. 2001).

When evaluating qualified immunity claims, the Court undertakes a two-step analysis. The Court must determine "whether the facts that a plaintiff has alleged or shown make out a violation

of a constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If the plaintiff's allegations fail to state a claim on which relief may be granted, the defendant is entitled to immunity. *See Callahan*, 555 U.S. at 232. On the other hand, if the plaintiff's allegations state a claim for violation of his constitutional rights, the Court must then determine whether the right in question was "clearly established" at the time the defendant acted. The defendant is entitled to qualified immunity unless his conduct violated a constitutional right that was clearly established as of the date he acted. *Ibid.* While these two prongs are generally considered in this order, the Supreme Court has held that courts have the discretion to consider them in the alternative order if such is more appropriate. *Id.* at 232-42.

The inquiry whether a particular right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (citation omitted). Courts are "not to define clearly established law at a high level of generality." *Ibid.* (citation omitted). The dispositive question is "whether the violative nature of *particular* conduct is clearly established." *Ibid.* (citation omitted). While the Court need not locate "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (citation omitted). Accordingly, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Ibid.* (citation omitted).

B.  Failure to State a Claim

A plaintiff's allegations are subject to dismissal for failure to state a claim on which relief may be granted unless the "[f]actual allegations [are] enough to raise a right for relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atlantic*

*Corp. v. Twombly*, 550 U.S. 544, 545 (2007). As the Supreme Court more recently held, to survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." If the complaint simply pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* As the Court further observed:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . .Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. . .Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the wellpleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not "show[n]" - "that the pleader is entitled to relief."

*Id.* at 678-79 (internal citations omitted).

## ANALYSIS

I. **Plaintiff's Security Classification**

As noted above, Plaintiff alleges that on or about August 7, 2014, Defendants Youngert, Williams, and Fenby conspired to increase Plaintiff's security classification in retaliation for a grievance Plaintiff previously filed against Defendant Youngert. Plaintiff further alleges that on or about August 26, 2014, Defendants Williams and Fenby did, in fact, increase his security classification

for improper retaliatory purposes.

      A.      Retaliation

The elements of a First Amendment retaliation claim are well known: (1) Plaintiff was engaged in constitutionally protected conduct, (2) Plaintiff suffered adverse action which would deter a person of "ordinary firmness" from continuing to engage in such protected conduct, and (3) there exists a causal connection between the protected conduct and the adverse action - in other words, the adverse action was motivated at least in part by Plaintiff's protected conduct. *See Thomas v. Eby*, 481 F.3d 434, 440 (6th Cir. 2007) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)).

As part of his amended complaint, Plaintiff submitted a copy of the Security Classification Screen that Defendant Fenby completed in August 2014. (ECF No. 15-1 at PageID.196). Because Plaintiff attached this document to his amended complaint, it is appropriate for the Court to consider such when assessing whether Plaintiff's allegations state a claim for relief. *See, e.g., Bassett v. National Collegiate Athletic Assoc.*, 528 F.3d 426, 430 (6th Cir. 2008). A review of this document reveals that Plaintiff's security classification score was not increased. Instead, Plaintiff's Management Score was decreased from 35 to 30. Management Scores between 25-35 correlate to security level V. Thus, Plaintiff's security classification score did not increase as a result of his August 2014 security classification review. In sum, Plaintiff's retaliation claim fails because he cannot establish that he suffered adverse action sufficient to maintain a retaliation claim. Accordingly, the undersigned recommends that Defendants Williams and Fenby are entitled to qualified immunity as to Plaintiff's retaliation claim.

      B.      Conspiracy

Plaintiff's conspiracy claim likewise fails to state a claim. It is improper for "two or

more persons" to conspire "for the purpose of depriving, either directly or indirectly," an individual of his civil rights. 42 U.S.C. § 1985. Plaintiff's claim fails, however, because he cannot establish that the alleged conspiracy deprived him of a right or privilege protected by the laws or Constitution of the United States. *See Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 314 (6th Cir. 2005). Accordingly, the undersigned recommends that Defendants Youngert, Williams, and Fenby are entitled to qualified immunity as to Plaintiff's conspiracy claims.

## II.    Verbal Assault and Spitting

Plaintiff alleges that on August 18, 2014, Defendant Youngert verbally abused him, spit in his face, and threatened to assault him if he responded to the provocation. Defendant argues that even accepting Plaintiff's allegations as true, he is entitled to relief because there does not exist clearly established authority establishing that such conduct violates Plaintiff's constitutional rights.

Plaintiff's allegations that he was subjected to verbal harassment do not implicate the Eighth Amendment. *See, e.g., Wingo v. Tennessee Department of Corrections*, 499 Fed. Appx. 453, 455 (6th Cir., Sept. 7, 2012) (verbal harassment is insufficient to maintain a § 1983 claim). Accordingly, the undersigned recommends that Defendant Youngert is entitled to qualified immunity as to Plaintiff's claims that he was subjected to verbal harassment.

With respect to Plaintiff's claim that Defendant spit on him, the Supreme Court has never held that every intentional touch or assault violates the Eighth Amendment. Instead, to implicate the Eighth Amendment, the force must constitute a malicious or sadistic use of force the nature of which is "of a sort repugnant to the conscience of mankind." *See Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992); *Wilkins v. Gaddy*, 559 U.S. 34, 36-38 (2010). While the Court certainly finds the act of intentionally spitting on an inmate to violate this standard, the fact is that there does not exist

-11-

authority clearly establishing that such is, in fact, the case. To the contrary, courts routinely hold that isolated incidents of spitting constitute the sort of de minimis force which do not implicate the Eighth Amendment. *See, e.g., Williams v. Gobles*, 2000 WL 571936 (6th Cir., May 1, 2000) (allegations that prison guard verbally harassed and spat on prisoner do not state a claim on which relief may be granted); *Gill v. Tuttle*, 93 Fed. Appx. 301, 303 (2d Cir., Mar. 29, 2004) (single act of spitting on prisoner does not rise above "a de minimis use of force" and, therefore, does not state an Eighth Amendment claim); *Watson v. Dunn*, 2016 WL 1170752 at *2 (W.D. La., Jan. 12, 2016) ("the alleged wrongdoing – spitting one time on Plaintiff – even if intentional was not harmful enough to establish a constitutional violation"); *Gordon v. Rondeau*, Case No. 2:16-cv-89, ECF No. 62, 64 (W.D. Mich., Feb. 8, 2018) (an isolated spitting incident "does not rise to an Eighth Amendment violation"). Accordingly, the undersigned recommends that Defendant Youngert is entitled to qualified immunity as to Plaintiff's claim that Youngert spit on him.

## CONCLUSION

For the reasons articulated herein, the undersigned recommends that Defendants' Motion to Dismiss, (ECF No. 21), be **granted** and this action **terminated**. The undersigned further recommends that there exists a good faith basis to appeal this matter. *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997); 28 U.S.C. § 1915(a)(3).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,

Dated: July 6, 2018        /s/ Ellen S. Carmody
                           ELLEN S. CARMODY
                           U.S. Magistrate Judge