UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RUFUS L. SPEARMAN #320836,

    Plaintiff,                                         Hon. Janet T. Neff

v.                                                           Case No. 1:17-cv-1070

CHAD H. WILLIAMS, et al.,

    Defendants.
_____/

## REPORT AND RECOMMENDATION

The Court has before it Defendants' Motion for Summary Judgment (ECF No. 53) and Plaintiff's Motion for Temporary Restraining Order. (ECF No. 65.) Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Defendants' motion be **GRANTED IN PART AND DENIED IN PART** and that Plaintiff's motion be **DENIED**.

### Background

Plaintiff, a prisoner currently incarcerated with the Michigan Department of Corrections (MDOC) at the St. Louis Correctional Facility, sued a number of MDOC employees pursuant to 42 U.S.C. § 1983 concerning events that occurred while Plaintiff was incarcerated at the Carson City Correctional Facility (DRF) in 2014. Several claims and Defendants were dismissed following initial review pursuant to 28 U.S.C. §§ 1915(e)(2), 1915A and 42 U.S.C. § 1997e(c) for failure to state a claim and as barred by the statute of limitations. (ECF Nos. 13, 14.) Pursuant to an Opinion and Order (ECF No. 34) entered on March 18, 2019, Plaintiff's Eighth Amendment claim was dismissed, leaving the following two claims: (1) on August 7, 2014, Defendant Fenby conspired with Defendants Youngert and Williams to change Plaintiff's security classification,

even though it did not appear appropriate; and (2) on August 26, 2014, in retaliation for Plaintiff's grievances, Defendants Williams and Fenby increased Plaintiff's security classification and transferred him to a Level V prison.  (ECF No. 31 at PageID.272; ECF No. 34 at PageID.302–03.)

The following facts are pertinent to Plaintiff's remaining claims.  Pursuant to Michigan Department of Corrections Policy Directive 05.01.130 ¶ D, a prisoner's security classification is determined by completing a "Security Classification Screen."  The security levels at MDOC facilities are designated Levels I, II, IV, V, and administrative segregation, with Level I being the least secure and administrative segregation being the most secure.  MDOC Policy Directive 05.01.130 ¶ B.  Security Classification Screens are conducted for various reasons, including "[i]f it has been 12 months since the prior screening."  *Id.* ¶ I(1).

The MDOC's Security Classification Screen – Review – Male Prisoners Only form includes two columns labeled "Confinement Level" and "Management Level," each of which contains several objective criteria that produce generic results, not necessarily reflective of the prisoner's security requirement.  (*See* ECF No. 54-4.)  The criteria under "Confinement Level" produce a particular custody level (I through V) set forth in box 1, while the criteria under "Management Level" produce a score ranging from 0 to 35 points, resulting in a management level (also I through V) set forth in box 2.  A score of 23-35 points results in a Level V Management Level.  One criterion of "Unfavorable Behavior" under the "Management Level" portion is "Number of acts resulting in separate class I–II misconducts" since the date of the prisoner's last screen.  At the bottom, the form contains boxes for "True Security Level" and "Actual Placement Level."  The form instructs the reviewer that "[i]f you agree that the highest level between boxes 1 or 2 correctly identifies this prisoner's true security needs, enter that level in box 3.  If not, enter

the appropriate level which does and the reason for the departure." In other words, in spite of the highest security level in boxes 1 or 2, the screener has discretion, based on actual experience with the prisoner's own behavior, to determine that a departure increasing or lowering the prison's security level is appropriate, reflecting the prisoner's True Security Level. (ECF No. 54-12.)

From 2010 through January 2014, Plaintiff had been assigned a True Security Level of IV and housed in Level IV units, even though his Management Level was a V, because the screeners had determined that he could "be managed in [a] reduced custody security level." (ECF No. 58-1 at PageID.562; ECF No. 59 at PageID.581.)[1] In February 2014, Plaintiff was transferred from Chippewa Correctional Facility to DRF. In connection with the transfer, a security screen was completed and, consistent with the prior screens, Plaintiff's True Security Level was determined to be Level IV—a departure from his Management Level V. (ECF No. 54-9.)

Plaintiff was initially housed in Unit 1200 at DRF, which was managed by Acting Resident Unit Supervisor (ARUS) Gehoski. In April 2014, Plaintiff was transferred to Unit 500, which was managed by Defendant Williams. (ECF No. 59 at PageID.583.) On May 14, 2014, Williams issued Plaintiff a Class II minor misconduct for possession of forged documents. According to the misconduct hearing report, Plaintiff gave Williams an oversized envelope to be mailed that already had metered postage on it, which was inconsistent with the facility's mail procedures. Plaintiff admitted that he had removed the postage from a package he had received from another facility because the meter was not stamped, and he believed he could reuse it. Plaintiff pled guilty to the charge. (ECF No. 54-13.)

---

[1] The Court considers Plaintiff's Declaration in Support of Plaintiff's Motion to Stay Defendants' Summary Judgment Motion (ECF No. 59) as part of his response to Defendants' motion for summary judgment.

On or about July 25, 2014, Plaintiff filed grievance DRF-14-07-01592-17C claiming that Defendant Youngert walked up to Plaintiff as Plaintiff was bending at a table and put his crotch into Plaintiff's face. The grievance triggered a Prisoner Rape Elimination Act (PREA) investigation, which concluded that Plaintiff's claims were unfounded. (PageID.55 at PageID.548.)

On July 30, 2014, ARUS Gehoski sent an email to Transfer Coordinator Renee Leik in Lansing, Michigan, stating, "Per Deputy Fenby, prisoner Spearman 320836 12-T-23 needs to be transferred. I spoke with Chad [Williams] and as of today he has 30 points." (ECF No. 54-3.) On August 12, 2014, Defendant Williams completed a security screen for Plaintiff, which Defendant Fenby approved that day or the following day. Consistent with prior screens, Plaintiff's Confinement Level was determined to be II and his Management Level was determined to be V, although his management points had dropped from 35 on the previous screen to 30. (ECF No. 54-4; ECF No. 54-9.) However, in contrast to previous screens dating back to 2010, no departure was given, and Plaintiff was assigned level V for both his True Security and Actual Placement Levels. (ECF No. 54-4.) DRF does not house level V prisoners. (ECF No. 56 at PageID.552.) Accordingly, on August 12, Transfer Coordinator Leik sent an email to Defendant Williams and others stating that Plaintiff would be transferring to Level V housing at Marquette Branch Prison (MBP) on August 26, 2014. (ECF No. 54-7.)

Plaintiff was transferred to MBP on August 27, 2014. On April 28, 2015, in connection with an impending transfer from MBP, Rebecca Horrocks performed a security screen of Plaintiff and assigned him True Security and Actual Placement Levels of IV, even though Plaintiff had 26 management points—within the range for a Level V Management Level. (ECF No. 58-1 at PageID.568.)

**Motion Standard**

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

**Discussion**

I.  **Motion for Summary Judgment**

   A.  **Retaliation Claim**

In order to state a First Amendment retaliation claim, a plaintiff must establish that: (1) he engaged in protected conduct; (2) the defendant took an adverse action against him "that would deter a person of ordinary firmness from continuing to engage in that conduct;" and (3) the adverse action was taken (at least in part) because of the protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In addition, a plaintiff must be able to prove that the protected conduct was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Defendants do not dispute that Plaintiff's grievance was conduct protected by the First Amendment. *See Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000) (observing that "[a]n

inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf" so long as they are not frivolous).  As for the second factor, the Sixth Circuit has held that an increase in a prisoner's security level constitutes a sufficient adverse action.  *King v. Zamaiara*, 680 F.3d 485, 487 (6th Cir. 2005).  Defendants argue that they "did not cause [Plaintiff's] security level to increase, as it stayed the same due to his point accumulation."  (ECF No. 54 at PageID.393.)  But Plaintiff's management points actually decreased from 35 on the January 2014 screen to 30 on the August 12, 2014 screen.  And Plaintiff's True Security and Actual Placement Levels did increase from IV to V.  (Compare ECF No. 54-4 and ECF No. 54-9.)  Defendants' own evidence shows that this increase necessitated the transfer from DRF to MBP, a level V facility.  Defendants also argue that Defendant Williams did not participate in Plaintiff's security classification screen, but this assertion is contrary to Defendants' own evidence.  ARUS Gehoski's July 30, 2014 email to Transfer Coordinator Leik indicated that Defendant Williams had already determined that Plaintiff had 30 management points, which would support a transfer to a level V facility.  (ECF No. 54-3.)  Moreover, the August 2014 screen form states that Defendant Williams screened the prisoner.  (ECF No. 54-3.)  Defendants further argue that they did not take an adverse action against Plaintiff because his security classification resulted from his management point accumulation, "which was aided by his own misconducts."  (ECF No. 54 at PageID.394.)  This argument improperly conflates the adverse action inquiry with causation, but regardless, as explained in more detail below, Plaintiff's evidence, including his past screening forms, indicates that a single misconduct—particularly one for possessing a forged document based on attempted use of a postage meter that had not been stamped or canceled—is not ordinarily a basis for determining that a prisoner could not be managed at a reduced custody security level.  For example, the screen completed on September 16, 2010, which assigned a True Security Level

6

of IV, shows that Plaintiff had five misconducts during the period covered by the screen. (ECF No. 58-1 at PageID.562.) Similarly, the April 28, 2015 screen from MBP assigning Plaintiff a True Security Level of IV shows that Plaintiff had two misconducts while at MBP. (ECF No. 58-1 at PageID.568.) Based on this evidence, a reasonable jury could conclude that Defendants Williams and Fenby were responsible for Plaintiff's increased True Security Level.

Defendants also argue that Plaintiff fails to present sufficient evidence showing a causal connection because he relies solely on the temporal proximity between his July 25, 2014 grievance against Defendant Youngert and the August 12, 2014 security screen that increased his True Security Level to Level V. The Sixth Circuit has observed that "the temporal proximity between the prisoner's protected conduct and the official's adverse action" can provide circumstantial proof of the official's retaliatory motive. *Hill v. Lappin*, 630 F.3d 468, 475–76 (6th Cir. 2010). As Defendants note, the Sixth Circuit has stated that temporal proximity, without more, is insufficient to demonstrate the requisite causal connection. *See Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001). In *Holzemer v. City of Memphis*, 621 F.3d 512 (6th Cir. 2010), the court observed that, in general, the Sixth Circuit has been reluctant to find that temporal proximity, alone, can establish that the filing of a grievance was a motivating factor, but it acknowledged the court's statements in First Amendment cases in the employment context that "on a particular set of facts, extremely close temporal proximity could permit an inference of retaliatory motive." *Id.* at 526 (quoting *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010)); *see also Muhammad v. Close*, 379 F.3d 413, 417–18 (6th Cir. 2004) (stating that temporal proximity may be "significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive") (quoting *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004)).

The Court need not determine whether the time between Plaintiff's grievance and the adverse action was close enough to warrant an inference of retaliatory motive without other evidence because other evidence in the record supports such an inference. *See Vereecke*, 609 F.3d at 401 ("In analyzing the facts in temporal proximity cases, we have always looked at the totality of the circumstances to determine whether an inference of retaliatory motive could be drawn."). Apart from timing, which is very close, particularly if one considers ARUS Gehoski's July 30, 2014 email (ECF No. 54-3), Plaintiff's evidence shows that since at least 2010, he was assigned True Security and Actual Placement Levels of IV in spite of having multiple misconducts during the relevant period. (*See* ECF No. 58-1 at PageID.562 (5 misconducts), 566 (6 misconducts).) The only circumstance Defendants cite for increasing Plaintiff's security level is the May 14, 2014 misconduct, which occurred almost three months before Defendants Williams and Fenby performed the August security screen. Given Plaintiff's consistent Level IV designation, a reasonable jury could conclude that Defendants were motivated not by the single misconduct for forgery but, rather, by retaliatory animus. Plaintiff also points out that a single forgery misconduct would not justify a Level V assignment, as such "facilities are reserved for those inmates [who] are mentally ill, violent, incorrigible, designated as STG (Security Threat Group), or a[re] predatorial."[2] (ECF No. 59 at PageID.582.) *See Jackson v. Stoddard*, No. 1:13-cv-1297, 2014 WL 2862614, at *1 (W.D. Mich. June 24, 2014) (noting that Level V is "a classification reserved for the prison system's most dangerous or unmanageable prisoners"). Accordingly,

---

[2] Defendants' argument that Plaintiff's "high volume" grievance activity undermines reliance on temporal proximity as circumstantial evidence of a causal connection is unpersuasive. As noted, other evidence, apart from temporal proximity, could support a finding of a causal connection. Moreover, *Dahlstrom v. Butler*, No. 2:18-cv-101, 2019 WL 91999 (W.D. Mich. Jan. 3, 2019), which Defendants cite as support for their argument, was a screening opinion applying the motion to dismiss standard rather than the summary judgment standard, as is the case here.

viewing the facts in the light most favorable to Plaintiff, Plaintiff has satisfied his burden of adducing sufficient facts to prove that the adverse action was motivated, at least in part, by his protected conduct.

The burden thus shifts to Defendants to demonstrate that they would have taken the same action even in the absence of Plaintiff's protected conduct. *Hill*, 630 F.3d at 475. "Where a plaintiff sets forth 'specific, nonconclusory allegations' of retaliation 'that could support a jury verdict at trial,' the defendant cannot carry his or her burden at summary judgment by offering mere 'summary denials.'" *Reynolds-Bey v. Harris*, 428 F. App'x 493, 505 (6th Cir. 2011) (quoting *Thaddeus-X*, 175 F.3d at 399). Because Defendants do not even offer a "summary denial" in response to Plaintiff's evidence, they have not met their burden.

    **B.**    **Conspiracy Claim**

Plaintiff's second claim is that Defendants Younger, Williams, and Fenby conspired to increase Plaintiff's security level. A civil conspiracy under Section 1983 is "an agreement between two or more persons to injure another by unlawful action." *See Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir. 1985)). The plaintiff must show the existence of a single plan, that the alleged co-conspirator shared in the general conspiratorial objective to deprive the plaintiff of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiff. *Id.*; *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011).

Defendant Youngert has submitted an affidavit in which he states, "[a]s a corrections officer, security classification for prisoners is not a part of my job duties. I did not conspire to have Spearman's security classification increased." (ECF No. 55 at PageID.548.) While there is sufficient evidence in the record to support a conspiracy claim against Defendants Williams and

9

Fenby, Plaintiff fails to point to evidence in the record rebutting Defendant Youngert's assertion that he had nothing to do with increasing Plaintiff's security classification, as it is not part of his job. Absent some evidence that Defendant Youngert was personally involved in the alleged unconstitutional behavior, there is no basis to impose liability on him for the alleged violation. *Rizzo v. Goode*, 423 U.S. 362, 371 (1976). Accordingly, Plaintiff fails to carry his burden of presenting sufficient evidence to create a genuine issue of material fact with regard to his conspiracy claim against Defendant Youngert. *See White v. Warren*, No. 07-12531, 2009 WL 276950, at *6 (E.D. Mich. Feb. 5, 2009), *report and recommendation adopted*, 2009 WL 540712 (E.D. Mich. Mar. 4, 2009) (stating that "plaintiff's claim that defendant Sergent was part of some conspiracy because he was 'close' with defendant McGraw is not sufficient evidence to defeat summary judgment").

    **C.    Qualified Immunity**

Defendants further argue that they are entitled to qualified immunity on Plaintiff's claims. The doctrine of qualified immunity provides that government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional right of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999). An "objective legal reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The qualified immunity inquiry requires a court to decide whether the facts as alleged or shown make out a constitutional violation or whether the right that was allegedly violated was a clearly established right at the time of the alleged misconduct. *Id.* at 232. If the court can conclude that either no constitutional violation occurred or that the right was not clearly established, qualified immunity is warranted. The court may consider either prong of the inquiry without regard to sequence. *Id.* at 236. As discussed above, an issue of fact remains as to whether Defendants Williams and Fenby retaliated against Plaintiff for filing a grievance on July 25, 2014. The filing of a prisoner grievance is constitutionally protected conduct for which a prisoner cannot be subjected to retaliation, and that right was clearly established. *See Smith*, 250 F.3d at 1037. Accordingly, Defendants are not entitled to qualified immunity on Plaintiff's claims.

**II.     Motion for Injunctive Relief**

Plaintiff has filed a motion for a temporary restraining order and preliminary injunction. Plaintiff's motion does not request any specific relief, although Plaintiff's proposed Order to Show Cause and Temporary Restraining Order directs Defendants and/or Defendants' counsel to show cause why Plaintiff should not be released "from detainment, incarceration, or imprisonment in order to prevent the Plaintiff from suffering any further irreparable harm." (ECF No. 65-1 at PageID.608.) In his brief in support of his motion, Plaintiff echoes the provisions of his proposed order, stating that he seeks to be placed "on house arrest," which "will actually cut costs and save money due to not having to house, feed, and supervise me around the clock." (ECF No. 66 at PageID.614.)

In considering a request for injunctive relief, a court normally considers and balances the following factors: (1) whether the movant has shown a strong or substantial likelihood or

probability of success on the merits; (2) whether the movant has shown irreparable injury; (3) whether the preliminary injunction could harm third parties; and (4) whether the public interest would be served by issuing a preliminary injunction. *Washington v Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994). In addition, particularly in situations impacting prison administration, courts are required to proceed with the utmost care and must recognize the unique nature of the prison setting. *See Kendrick v. Bland*, 740 F.2d 432, 438 n.3 (6th Cir. 1984).

Here, the Court need not engage in balancing the above factors because the Court has no basis to grant Plaintiff's requested relief. As the Sixth Circuit has stated, "release from custody . . . is not available through an action filed pursuant to § 1983." *Alstatt v. Smith*, No. 91-5791, 1991 WL 193747, at *2 (6th Cir. Oct. 1, 1991); *see also Cunningham v. Wilson*, 326 F. App'x 948, 949 (7th Cir. 2009) ("[R]elease from custody is not a form of relief available . . . to a federal inmate challenging the conditions of his confinement."). Even if a prisoner prevails on his federal civil rights claim, the appropriate remedy would be damages and possibly injunctive relief against any continuing unlawful acts or practices, not release from prison. *See Gomez v. United States*, 899 F.2d 1124, 1126 (11th Cir. 1990). For these reasons, Plaintiff's request for release to "house arrest" and his motion must be denied.

## Conclusion

For the reasons set forth above, I recommend that the Court **grant** Defendants' Motion for Summary Judgment (ECF No. 53) with respect to Plaintiff's conspiracy claim against Defendant Youngert and dismiss Defendant Youngert from the case and **deny** the balance of Defendants' motion. Finally, I recommend that the Court **deny** Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction. (ECF No. 65.)

## **NOTICE**

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


Dated: February 6, 2020                                  /s/ Sally J. Berens
                                                                                                  SALLY J. BERENS
                                                                                                  U.S. Magistrate Judge